**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GENERAL III, LLC d/b/a SOUTHSIDE RECYCLING, | ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| RMG INVESTMENT GROUP, LLC, | ) | Case No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO and DR. ALLISON ARWADY, in her Official Capacity as the Commissioner of the Chicago Department of Public Health, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR MANDAMUS TO ISSUE A
LARGE RECYCLING FACILITY PERMIT, INJUNCTIVE RELIEF,
BREACH OF CONTRACT AND ILLEGAL TAKING OF PROPERTY**

General III, LLC d/b/a Southside Recycling ("Southside Recycling" or "SR") and

RMG Investment Group, LLC, for their Complaint for Mandamus to Issue a Large Recycling

Facility Permit, Injunctive Relief, Breach of Contract and Illegal Taking of Property, against the

City of Chicago (the "City") and Dr. Allison Arwady ("Dr. Arwady"), in her Official Capacity as

the Commissioner of the Chicago Department of Public Health ("CDPH"), state as follows:

**INTRODUCTION**

This is a case about a company with a strong and lengthy track record of Chicago

operations that made a massive $80 million investment in the City of Chicago and, in reliance on

a written contract with the City, and on CDPH's published permitting rules, submitted a permit

application to operate a large recycling facility known as Southside Recycling. Following a

two-year zoning, rulemaking, and permitting review process, SR built the most environmentally conscious recycling facility in the country and has fully complied—and then some—with every City requirement necessary to be granted an operating permit.  Over several months in early 2021, City officials repeatedly told SR that it had met all requirements for issuance of the permit and that the permit would be issued.  Yet, when it came time for the City to follow its own rules and promises, and to award the permit to SR, the City chose to avoid, delay, and suspend its review of SR's permit application.  As a result, facing irreparable harm and financial damage, SR asks this Court today to do what the City was obligated to, but failed to do:  issue SR the operating permit.

1.    Southside Recycling files this Complaint seeking, among other things, a writ of mandamus, requiring the City to issue to Southside Recycling a Large Recycling Facility ("LRF") permit pursuant to Section 11-4-2520 of the City's Municipal Code and the City's Rules for Large Recycling Facilities ("LRF Rules").  The case for mandamus is compelling:

(a)    After receiving a written promise from the City to cooperate in the transition of the business to the new Southeast Side location, including the efficient and expeditious review of permits;

(b)    After receiving a special use permit from the Chicago Zoning Board of Appeals to operate a Class IVB recycling facility on the property it has owned for decades;

(c)    After obtaining an air pollution control construction permit from the Illinois Environmental Protection Agency (IEPA) which reflected review and comments from the United States Environmental Protection Agency (USEPA) and which expressly addressed the important environmental justice concerns of the community;

(d)      After obtaining air pollution control permits from CDPH—the same entity that grants the permit at issue in this case—to construct and install all of the equipment necessary to operate the facility;

(e)      After spending $80 million to construct the best in class recycling facility, which testing and air dispersion modeling has proven will be protective of human health in a manner beyond what is required by health-based standards, even when considering the cumulative impact on an environmentally burdened community;

(f)      After submitting a permit application to CDPH, establishing that it has satisfied the new, stringent LRF Rules that CDPH created in the middle of this process;

(g)      After the owners of SR closed their profitable operation on the North Side in reliance on all of the preceding; and

(h)      After being told by CDPH repeatedly, over multiple months, that the permit application met all requirements under the LRF Rules and that its permit would be issued imminently.

Southside Recycling now confronts a City which has violated its LRF Rules and its Contract with SR by failing to issue the permit, without offering even a single legally justifiable excuse. There are many risks undertaken when building an $80 million state-of-the-art recycling facility. But one risk that SR did not take was that after full compliance with every requirement, the City would decide to set aside its rules and Agreement and suspend the permit review. This Court must step in to remedy the City's violations and award the permit.

2.      The City officials responsible for reviewing SR's LRF permit application, including Dr. Arwady, have already acknowledged that SR has satisfied the LRF Rules and is entitled to the permit.  The City's repeated acknowledgments are detailed below.

3.      This request for mandamus is even stronger than the typical request to enforce a city's permitting regulations.  Here, the City's intentional delay in issuing the LRF permit violates not only its own Municipal Code and the LRF Rules, but also violates the express terms of a signed "Term Sheet Regarding General Iron/RMG Interim Operating Plan, Cessation of Northside Operations and Southside Transition," dated September 10, 2019 (the "Agreement"), attached hereto as Exhibit A.   In that Agreement, the City promised the owners of Southside Recycling that the City would cooperate in an efficient and expeditious transition of Southside Recycling's business to the specific new location (11600 South Burley), by providing "reasonable assistance with processing and review of license and permit applications."  *Id.* at ¶ 5. The text and the only reasonable interpretation of the Agreement elucidate several points:  (1) the City understood that the owners of Southside Recycling would be making an enormous capital investment in the new Southeast Side facility; (2) the City agreed to cooperate with and support those efforts, including efficient and expeditious review of required permits and licenses; and (3) as long as the new facility satisfied all permitting rules, the City would issue the permit without delay.  The City understood that the owners of Southside Recycling would be relying on the applicable permitting and licensing rules, and the City had no discretion to delay or deny an SR permit application that complied with all of the rules.  In reliance on the Agreement and the LRF Rules, the owners of SR ceased operations at its very profitable North Side facility and spent approximately $80 million on its new state-of-the-art Southeast Side facility.  The owners of Southside Recycling abided by that Agreement, but the City has not honored the most important

aspects of its bargain.  Under these circumstances, Illinois law provides for mandamus relief in the form of a court order to Commissioner Arwady to issue the LRF permit to Southside Recycling.

4.     The detailed facts below explain that external forces, using the moniker of environmental justice, have attempted to convince the City to deny Southside Recycling the LRF permit to which it is entitled.  It is important to note that this lawsuit does not present a debate over the importance of environmental justice.  Southside Recycling is not part of an environmental justice problem.  Its commitment and financial investment in the most state-of-the-art pollution controls are actually part of the solution to maintaining environmentally conscious industry and economic opportunity in Chicago.  Southside Recycling has proven its commitment to the community's important environmental justice concerns, spending $80 million on a state-of-the-art metal recycling facility to ensure its operation would be protective of human health in a manner beyond what is required by applicable health-based standards, and be protective of the air quality on the Southeast Side.  Southside Recycling conducted rigorous air dispersion modeling analyses to address the environmental justice concerns raised by the community.  These analyses explicitly took into account the Southeast Side's existing environmental burdens.  Modeling experts from the IEPA directed, independently reviewed, and ran the air dispersion modeling, and concluded that the impact from the facility would be protective of the health of the surrounding community.[1]  The modeling was based, in part, on the results of emission testing conducted at the North Side facility, which utilized the same pollution control equipment installed at Southside Recycling.  That emission testing was supervised by the USEPA and demonstrated that the emissions from the shredder, as controlled, were far below any health-based limits.  In addition, USEPA technical experts (not political appointees) consulted with the IEPA throughout the permit process, and reviewed and commented on the air dispersion modeling and the IEPA draft permit.  The USEPA

Region 5 Air Permits Chief stated that the technical staff's comments were intended to ensure that the permit record supported the decision to issue the permit and that it "appreciates IEPA's efforts to address community concerns surrounding this project and ensure the permit meets all federal and state requirements." Moreover, the emissions from the SR facility will be continuously monitored. The LRF Rules require SR to continuously monitor actual particulate matter emissions at the property boundaries. Monitoring will be conducted 24 hours a day, 7 days a week, 365 days a year. SR's emissions will also be monitored by the IEPA's nearby air monitor, which will provide information concerning any emissions impact from the SR facility.

5. Southside Recycling will recycle more than 700,000 tons of obsolete metal per year from Chicago and surrounding areas. Recycling obsolete scrap metal is a necessary part of environmental sustainability. Notably, consumers and businesses—not metal recyclers—create obsolete metal. The metal recycling process allows obsolete metals to be reused and keeps these useful resources out of landfills. Further, manufacturing of new products using recyclable metals also reduces the need for energy and resource intensive mining of virgin metal-making minerals from the Earth. Concerned community members and environmental advocates who oppose the LRF permit here have ignored the clear-cut facts that demonstrate that Southside Recycling's operations will comply with all applicable environmental regulations and health-based standards, even when considering the community's existing air emission sources and air quality. In an initial outreach meeting with interested community members and environmental advocates, the individual owners of Southside Recycling offered a continued dialogue with the community and a commitment to address any and all of their concerns to the fullest extent possible. But, after the initial meeting, these community members refused to participate in any further meetings with Southside Recycling. Instead, they pledged unconditional opposition.

6.     After the CDPH repeatedly acknowledged Southside Recycling's satisfaction of all permitting criteria, the City ran out of excuses for failing to issue the permit as required.  In its latest move, the City solicited a letter from the USEPA's new administration in an effort to give the City a new excuse to delay further the permit it had already agreed to issue. Citing no legal authority whatsoever, and in complete disregard of the stringent IEPA and CDPH rules that Southside Recycling has satisfied, the USEPA has now changed its mind about the sufficiency with which the IEPA's review satisfied community concerns.  More than two years into this comprehensive regulatory review process, the USEPA has asked the City to suspend the LRF permit review.  The City improperly agreed to do so.

7.     Sims Metal Management operates the only other metal shredding large recycling facility in Chicago, in the Pilsen neighborhood, an environmental justice area.  Sims's shredder contains none of the pollution control equipment that Southside Recycling has spent millions of dollars installing.  *See* May 6, 2020, "Evaluation of Shredder VOM Emissions Testing Results – SIMS South Paulina, Chicago, Illinois . . . ," by John G. Pinion of RK & Associates, Inc., attached hereto as Exhibit B.  If the City applies a consistent standard of environmental justice, it would not be allowing Sims's shredder to operate in an environmental justice area without any controls whatsoever on its shredder, while denying SR—and its state-of-the-art facility—the permit needed to operate.

8.     In late 2020, when the City's constant delays in the permit review process made clear that Southside Recycling would not have a permit by December 31, 2020, the SR owners questioned whether they still needed to cease operations on the North Side.  When SR posed this question, the City threatened to stop the permitting review process altogether if the North Side operation did not close as contemplated in the Agreement.  In compliance with the

Agreement, and ceding to the City's demands, the owners of Southside Recycling stopped its North Side operation. At this time, the City continued to reassure SR that the City had every intention of moving the process along to award the permit in early 2021. Since that time, SR has jumped through every possible hoop, has supplied every last piece of information, has cooperated through every City delay, and has more than satisfied every permitting requirement.

9. Whether you are an individual citizen or a business that has spent $80 million creating the most environmentally conscious metal recycling plant in the country, you must be able to rely on a government that follows the law and its agreements. In this particular case, the City's failure to issue the LRF permit to SR comes at the expense of the Pilsen community, which faces an increased allocation of metal recycling and elevated air emissions from a recycling operation with no emissions controls on its shredder. The City's failure also comes at the expense of the hundreds of workers, thousands of individual recyclers (many of whom are minorities) and small businesses who count on Southside Recycling's economic engine for their livelihood. This Court must step in and remedy the City's violation of law.

## JURISDICTION AND VENUE

10. Plaintiff General III, LLC d/b/a Southside Recycling is an Ohio limited liability company formed for the purpose of operating a large recycling facility on property owned by an affiliated company at 11600 South Burley Avenue (also known as 11554 South Avenue O) in Chicago. It has filed an application with the Chicago Department of Public Health for a permit to operate a large recycling facility.

11. Plaintiff RMG Investment Group LLC is an Ohio limited liability company, a signatory to the September 2019 Agreement, and one of the ultimate principal owners of both Southside Recycling and the property on which the proposed recycling facility will operate. The majority owners of Southside Recycling and the property are referred to collectively as "RMG."

12.     Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois.

13.     Defendant Dr. Allison Arwady is the Commissioner of the Chicago Department of Public Health.  Commissioner Arwady has the authority to issue the subject permit.

14.     This Court has jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claim that the City violated Plaintiffs' rights under the Fifth and Fourteenth Amendments of the United States Constitution because that claim "arises under" the Constitution.

15.     This Court has supplemental jurisdiction over Plaintiffs' claims for mandamus and breach of contract under 28 U.S.C. § 1367 because those claims are so related to the Constitutional claim such that they form the same case or controversy under Article III of the Constitution.  In particular, the United States Environmental Protection Agency has interfered with the City's permit review process without any legal basis for doing so.

16.     Venue for this case is proper in this judicial district because all of the Defendants reside in this judicial district, and all of the events which give rise to the claims occurred here.

## BACKGROUND AND PERMITTING TIMELINE

17.     Beginning no later than 2018, the City had been pressuring General Iron to close its lawfully run, properly permitted metal recycling facility, which it had operated on the North Side for decades.  General Iron finally succumbed to the pressure and sold its assets to RMG, which planned to build the most environmentally conscious metal recycling facility in the country, on a 175-acre property at 11600 South Burley that RMG has owned and used for other recycling operations for decades.

18.     RMG promptly applied to the Chicago Zoning Board of Appeals for a special use permit to operate a Class IVB recycling facility on RMG's Southeast Side property.

The Zoning Board of Appeals conducted an extensive public hearing, which included testimony from sophisticated environmental advocates, air emissions experts, and City officials. The Zoning Board of Appeals issued a 15-page report, including findings of facts, approving Southside Recycling's special use application and license for a Class IVB recycling facility. *See* "Findings of the Zoning Board of Appeals in the Matter of the Special Use and Variation Applications for 11600 S. Burley Avenue by General III, LLC," attached hereto as Exhibit C.

19.     On September 10, 2019, the City, General Iron and RMG entered into an Agreement to facilitate the closing of the metal recycling facility on the North Side and the permitting of a new metal recycling facility to be constructed and operated by Southside Recycling on the RMG property described above. Under the Agreement, RMG and General Iron (the company whose assets RMG purchased) agreed to cease operations of its validly permitted, profitable business on the North Side. In exchange, the City agreed to "reasonably cooperate with RMG in achieving the efficient, expeditious transition" of the metal recycling operation to the new Southside Recycling facility, including reasonable assistance with processing and review of license and permit applications, and the scheduling of public hearings.

20.     On September 24, 2019, Southside Recycling submitted an application to the Illinois Environmental Protection Agency Bureau of Air for an air pollution control construction permit, pursuant to 35 Ill. Adm. Code 201.146 (the "IEPA Permit").[2] SR's application demonstrated, among other things, how the new facility would control air emissions in a manner that would be protective of human health and the environment. SR's application went beyond the permit requirements and included rigorous air dispersion modeling analyses that took into account the existing air quality in the community surrounding the new facility. The modeling utilized worst-case scenarios by using a shredding rate equal to 175% of the amount allowed in the IEPA

permit, and used background particulate matter emissions that far exceeded historical values. The air dispersion modeling analysis demonstrated that the air emissions from the new facility would comply with all applicable health-based standards, even when the existing levels of air emissions from other surrounding sources were taken into account. The IEPA conducted a rigorous permit application review and approval process, in accordance with its Environmental Justice Policy that was developed in coordination with the USEPA, during which it conducted a public hearing and received 329 written comments, including from many of the most sophisticated and vocal environmental advocacy groups—operating both locally and nationally. On June 25, 2020, the IEPA issued to SR an air pollution control construction permit to construct the new facility.[3] Concurrently, the IEPA issued a 73-page Responsiveness Summary which addressed all significant permit-related comments, and explained how the IEPA enhanced the draft construction permit by adding conditions specifically to address the public comments raised during the permitting process.[4] The IEPA sought the USEPA's review and comments on the draft permit. The USEPA provided the IEPA with detailed comments on the draft permit before it was issued and then commended the IEPA for addressing community concerns surrounding the project. All of the USEPA comments were fully addressed in the IEPA's Responsiveness Summary.

21.     In reliance on that IEPA permit, as well as the City's agreement to expedite its own permitting process and issue a permit consistent with the permitting rules, SR began construction of the new facility.

22.     Also, in June 2020, the City issued a radical new set of rules for the permitting of large recycling facilities entitled "Rules for Large Recycling Facilities." These LRF Rules were created after the City consulted with well-respected local and national environmental advocates, as well as local recycling companies. The resulting LRF Rules have

been regarded as some of the most environmentally stringent regulations for recycling facilities anywhere in the country. The City has acknowledged that the LRF Rules were created primarily to address the new SR facility. Southside Recycling's application for a LRF permit satisfies all of the City's new permitting criteria in the LRF Rules.

23.     Between July 23 and August 20, 2020, Southside Recycling applied to CDPH to obtain Air Pollution Control (installation) permits for numerous pieces of equipment and various other activities at the facility. CDPH reviewed the applications and granted those permits on September 15, 2020, allowing installation of that equipment to commence. In addition, the City's Department of Buildings issued building permits for the new facility. At each and every step in the process of constructing this new state-of-the-art facility over many months, CDPH has continued to confirm that SR was on track to obtain its LRF permit. While there have been occasions when CDPH has requested additional information, such information has always been promptly provided by SR, and has always been recognized by CDPH as complete and sufficient. At no time since construction of the SR facility commenced has a single City department or employee given any indication that construction of the SR facility should cease, or that any permits or licenses required to operate the facility would not be issued. To the contrary, every permit or approval that SR has been required to obtain until this point has been issued by the City. CDPH has never suggested that the LRF permit may not be issued to SR, in fact, CDPH has repeatedly told SR that the LRF permit will be issued imminently. SR has constructed the facility as it was designed and in accordance with the City's permits and regulations. All that stands in the way of its operation is CDPH's issuance of SR's LRF permit.

24.     In accordance with Section 11-4-2520 of the Municipal Code and the new LRF Rules, on November 12, 2020, Southside Recycling submitted an application to the City for a LRF permit.  It was received by the CDPH no later than November 14th.[5]

25.     *After* SR submitted its permit application, the CDPH issued Guidelines Regarding Permitting Processes for Consequential Large Recycling Facilities.  These Guidelines contained additional permitting rules under Section 11-4-2520 of the Municipal Code which govern CDPH's determination of when and how to issue an LRF permit.  Those Guidelines state as follows:

> **(1)   Permit Application Receipt, Posting, Public Comment, and Community Meeting.**
>
> Within **five (5) business days** from receipt of a full application, CDPH will post the application (minus any Confidential Business Information ("CBI"), which is designated as such through CDPH's CBI process) on the City's website.  CDPH will accept written comments on the permit application for **thirty (30) days** from the date that CDPH posts the permit application.
>
> *         *         *
>
> **(2)   Permit Application Review, Review of Public Comments on Application, Completeness Determination.**
>
> **No sooner than five (5) days and no later than thirty (30) days** from the end of the public comment period on the application, CDPH will review the public comments and complete a review of the application per the standards set forth in the Rules and the Ordinance.  Within this same time period, CDPH will make a determination regarding whether the application is complete and meets all requirements of the Rules and Ordinance.
>
> **(3)   Deficient Application.**
>
> If CDPH finds any deficiency(ies) in the application or has questions during its review of the application, CDPH will notify the applicant and request a written response and/or supplementary information as the deficiency(ies) are identified.  CDPH will post each such notification on the City's website.

If, after reviewing all of the applicant's responses, CDPH finds that the application is still incomplete or does not meet all requirements, CDPH will either notify the applicant of the remaining deficiencies and provide a final opportunity to remedy them, or will issue a permit denial letter, depending on the nature and extent of the deficiencies. If the permit is denied, the applicant will be informed of the appeal process per Code requirements.

\* \* \*

**(4) Draft Permit and Public Comments on Draft Permit.**

If, within **sixty (60) days** of posting of the application or supplemental application, CDPH finds that the application is complete and meets all requirements of the Rules and Ordinance, CDPH will prepare and post a draft permit on the City's website for public review and comment.

\* \* \*

**(5) Permit Issuance and Summary Document.**

Within **thirty (30) days** of the close of the public comment period on the draft permit, CDPH will review all public comments and will make any necessary adjustments to the draft permit. If all requirements for permit issuance are met, CDPH will finalize the permit and prepare a summary document that takes into account the public comments received (both written and expressed verbally at the community meeting) and describes the basis for CDPH's decision regarding the permit application and issuance of the permit. If CDPH determines that all requirements for permit issuance are not met, CDPH will either request supplemental information from the applicant (following the process described above) or else will issue a permit denial letter and inform the applicant of the appeal process per Code requirements.

26. In accordance with Section 1 of the Guidelines, the City began receiving public comments on SR's permit application. On December 10, 2020, the City conducted a public hearing. In accordance with Section 3 of the Guidelines, on December 23, 2020, the City issued to Southside Recycling a letter alleging certain informational deficiencies with SR's permit application. On January 13, 2021, SR submitted a supplemental application providing full information addressing each and every one of the City's alleged deficiencies.[6] In addition, SR and the City conducted several hours of phone calls to review, in great detail, specific responses to

each and every one of the alleged deficiencies. Since that time, the City has repeatedly acknowledged to SR that not only were all of the alleged deficiencies adequately addressed, but also that Southside Recycling's permit application, as supplemented, satisfied the LRF Rules, and that no further information was required from Southside Recycling. Thus, under Section 4 of the Guidelines, the City was required to issue a draft permit to SR by no later than March 15, 2021; and with another 30-day public comment period, the City was required to issue a final permit by May 15, 2021.

27. Despite repeatedly telling SR that it had satisfied the LRF permitting criteria, the City violated its own Guidelines by failing to issue the draft permit by March 15, 2021. It also has not honored its promise in Section 6 of the Agreement to conduct any type of meeting between Commissioner Arwady and SR. To date, no such meeting has been granted, despite SR's repeated requests, including written requests on March 12, 2021 and April 26, 2021, attached hereto as Exhibits D and E, respectively.

### THE CITY'S REPEATED ACKNOWLEDGMENT
### THAT SOUTHSIDE RECYCLING HAS SATISFIED THE LRF RULES

28. On January 25, 2021, Dave Graham, the Assistant Commissioner of CDPH, told Renante Marante, an Environmental Engineer for CDPH, to create a draft LRF permit for Southside Recycling so that it could issue that draft permit by February 3, 2021. The issuing of a draft permit means that SR has satisfied all permitting requirements and that the draft permit is subject only to further public comment. In fact, no draft permit was issued on February 3, 2021, but the City did not reveal any deficiency in the application to justify its failure to issue the draft permit by that date.

29. On February 10, 2021, Mort Ames, Senior Counsel in the City Law Department, spoke to counsel for Southside Recycling and communicated that the City had all of

the information it needed from SR to issue the draft LRF permit and that the City was simply reviewing the final comments on the draft permit. In that conversation, Mr. Ames did not reveal any deficiency in SR's application to justify the City's failure to issue the draft permit.

30. On February 24, 2021, Jim Kallas, the Environmental Manager for Southside Recycling, and Adam Labkon, a principal of Southside Recycling, spoke to Dave Graham. Mr. Graham indicated that the City was now drafting a responsiveness document (called a Summary Document in Section 5 of the CDPH Guidelines) to go along with the draft LRF permit. As laid out in Section 5 of the Guidelines, the Summary Document is meant to address the public comments to the permit application, explaining why the City decided to issue the final permit. Mr. Graham indicated that the responsiveness document, to be issued contemporaneously with the draft LRF permit, would expedite the process of the City's issuing the final permit. Indeed, when the IEPA issues responsiveness summaries, it does so contemporaneously with its final permits. Mr. Graham explained that the City had already received several rounds of extensive public comments and therefore, by issuing the responsiveness summary with the draft permit, there would be no need to make further revisions to the final permit. Mr. Graham indicated that the City was on track to issue the draft permit within two weeks. Again, the City did not reveal any deficiency in SR's permit application to justify failure to issue the draft permit.

31. On March 3, 2021, Jim Kallas and Adam Labkon again spoke with Dave Graham about the timing for the draft permit. Mr. Graham indicated that the City was on track to issue it by March 14th. Again, the City did not reveal any deficiency in the permit application to justify the failure to issue the draft permit. Mr. Graham confirmed that SR had provided all the information the City needed.

32.     Instead of issuing the draft LRF permit on March 15, 2021, as the City was required to do according to its own Guidelines, the City violated its legal duties and asked Southside Recycling for information extraneous to the LRF permitting process.  On March 17, 2021, the CDPH issued a letter to SR requesting—for the very first time—information about long-existing facilities/businesses adjacent to the new SR facility, which have some overlapping ownership with the owners of SR.[7]  The City had complete knowledge regarding the ownership and operation of the adjacent facilities at the time SR first submitted its application.  Moreover, the above-referenced air dispersion modeling analysis performed for the IEPA accounted for background air emissions, including from the adjacent businesses, which the IEPA acknowledged were not of concern.[8]  The City failed to provide any explanation as to how the new requested information fell within the scope of the LRF Rules or the permitting criteria for a large recycling facility.  The City admitted that it had changed its approach to the permit review in order to address political opposition to the LRF permit.  In the spirit of cooperation, on March 24, 2021, SR submitted another lengthy document to the City about these adjacent facilities.[9]  CDPH did its own modeling with independent experts and confirmed the accuracy of the IEPA's modeling experts.  CDPH then acknowledged that the submitted information satisfied the City's concerns and would not affect SR's right to the draft LRF permit.

33.     Indeed, on March 27, 2021, Dave Graham told Adam Labkon and Jim Kallas there was no reason not to issue the draft LRF permit by March 31, 2021.  No permit was issued by March 31, 2021.

34.     For the next two weeks, SR had repeated phone conversations with various representatives of the City who continued to report that the draft LRF permit was "days away" from issuance, though it would contain some special conditions.  One such conversation occurred

between Mort Ames, Senior Counsel in the City Law Department, and counsel for SR on March 31, 2021. In none of those calls did any City official indicate that there was any deficiency in SR's permit application. In fact, in a phone conversation between Dave Graham and Jim Kallas on April 12, 2021, Mr. Graham stated that the only reason he thought a draft permit could be delayed beyond that week would be due to other political/PR issues facing the City. This statement was yet another admission by Mr. Graham that the City had violated its own Guidelines which required the City to have issued the draft LRF permit by March 15, 2021.

35. Finally, during a phone call on April 19, 2021, Hal Tolin, a principal of Southside Recycling, was informed by Mr. Graham that Commissioner Arwady had stated that it was time to move forward with issuing the draft LRF permit to SR. Yet, no permit has been issued. The City's failure to issue the permit is in violation of the LRF Rules and CDPH Guidelines. It also contravenes the City's written Agreement with the owners of Southside Recycling. Again, the City refused to honor the requirement, in Section 6 of its Agreement, that it arrange a meeting between Commissioner Arwady and SR, despite an express request by SR in yet another letter to Dr. Arwady dated April 26, 2021. (Exhibit E.)

## THE CITY HAS CONSCIOUSLY PRIORITIZED
## POLITICS OVER ITS LEGAL OBLIGATIONS TO SR

36. Under Illinois law, the issuing of a permit is not a discretionary act. If a business satisfies stated permitting requirements, it is entitled to the permit. The City's failure to issue the LRF permit in this case is particularly egregious because the City entered into an Agreement with the owners of SR in which it acknowledged its obligation to "cooperate with RMG in achieving the efficient, expeditious transition of the Business to the Southside Properties, including reasonable assistance with processing and review of license and permit applications."

(Exhibit A.)  The City afforded itself no discretion to deny the permit if all permit requirements were satisfied.

37.    In reliance on the City's commitments, SR made major sacrifices at very significant financial cost.  First, on December 31, 2020, RMG stopped operating its business on the North Side, even though RMG has a valid permit to operate that business until February 24, 2022.  The profit from that business just from January 1, 2021 through April 30, 2021 would have been at least several million dollars.

38.    Second, and even more importantly, Southside Recycling has spent $80 million building the most environmentally conscious metal recycling facility in the country. The new facility includes an enclosure around the shredder and a state-of-the-art emissions capture and control system, consisting of a capture hood, a high efficiency cyclone, a roll-media filter system, a regenerative thermal oxidizer, and a wet scrubber.  This system not only exceeds all of the requirements set forth in the City's LRF Rules, but is the most advanced emissions capture and control system of any shredding facility in the United States.  As explained above, there is no question that SR has satisfied all applicable permitting requirements.

39.    The City has violated its duty to issue the LRF permit because certain community groups and environmental advocates have presented to the City a false choice between permitting the new facility and providing environmental justice to the surrounding community. These groups have not, and cannot, dispute SR's legal entitlement to the permit, nor can they contest the emission testing results, air dispersion modeling analyses or other science that demonstrates how SR's state-of-the-art facility more than satisfies all applicable environmental health-based standards.  Likewise, the USEPA's choreographed last minute request for a pause in the permit process ignores its own technical staff's previous approval of efforts to address

community concerns. The USEPA's request is not supported by any legal authority, and the undefined environmental justice analysis it requests is not contained in any law, regulation or rule. Given that Southside Recycling will be subject to continuous air emissions monitoring for particulate matter at the property boundaries and is required to comply with extensive monitoring, recordkeeping and reporting obligations under its IEPA permit and the LRF Rules, the USEPA will have access to complete and timely data to confirm SR's compliance with all applicable requirements. There is no reason or legal basis for its request to stop the permitting process at all, let alone for an indefinite time period.

40.     Neither the law nor the Agreement permits the City to abandon its obligations and instead cater to this false narrative, or to the *ultra vires* request by the USEPA. The facility on the Southeast Side is simply a far superior location at which to operate a large recycling facility. It has 175 acres of buffering space to mitigate and contain air emissions and dust, as compared to the 10 acres on which the North Side facility operated. In addition, the expansive footprint avoids the staging of trucks in the public way. Unlike the North Side facility, the new facility is serviced by two railroads which reduces the need for truck transportation.

41.     The political opposition also claimed that closing the operation in the wealthier, whiter North Side community and moving it to a lower income community of color was motivated by racism. The explanation of the move as described above proves racism was not at play. Moreover, the allegations of racism were examined by a federal court when the vocal opposition sued the City and filed a motion to enjoin the City from issuing the permit to SR. The Court denied the motion and determined that the charges of racism were not supported by the evidence. The lawsuit has since been voluntarily dismissed.

42.     There is additional, compelling evidence that the City's delay of the permit issuance actually undermines any concern over environmental justice.  The only other large recycling facility in the Chicagoland area is located in the Pilsen neighborhood, an environmental justice area.  It is operated by Sims Metal Management, and it employs ***none*** of the pollution control equipment that will be utilized at the new SR facility's shredder.  The Sims facility has nowhere near the buffering from the nearby residences and retail businesses.  Notably, the Pilsen community is reported to have some of the worst air quality scores in the City.[10]  By failing to issue the LRF permit to Southside Recycling, the City is allowing more metal to be processed and recycled by a shredder with no pollution control equipment, thereby further overburdening the community of Pilsen and surrounding neighborhoods.  The City has failed to follow the law and abide by all terms of the Agreement with SR, including its commitment in Section 7 to "enforce its ordinances, rules, regulations, licenses, permits and policies as necessary to protect the public health and safety and welfare, applying such enforcement neutrally and consistently to General Iron, RMG, *and other metal recycling facilities in the City*." (emphasis added).  In order for the City to follow the law, abide by all terms of the Agreement, protect the public health of its citizens and implement the most sound environmental policy, it must issue the LRF permit to SR and not allow increased metal recycling to be performed by an operator with no pollution controls on its shredder.

### OTHER DAMAGES FOR THE CITY'S FAILURE TO ISSUE THE PERMIT

43.     In addition to exposing Chicago, and more specifically the community of Pilsen and its surrounding neighborhoods, to elevated air emissions, the City is causing additional harm to a host of stakeholders, not limited to Southside Recycling.  The North Side operation was a major purchaser of obsolete metal within the City and surrounding areas.  Much of that material is collected and sold by hundreds of other small businesses and thousands of individual recyclers

in Chicago. The vast majority of these individual recyclers are Black and/or Latinx Chicagoans. With one of the Midwest's major scrap metal purchasers not able to operate, and with no replacement in sight, these individuals and businesses have faced a 30% or more reduction in the prices they would have received for the material they collect and sell had SR been able to contribute to a competitive marketplace. This decrease in the Chicagoland area's recycling capacity is causing serious financial losses to many of these individual recyclers and small businesses who are running out of space to store material and who will be forced to lay off employees and/or close their businesses.

44.     Southside Recycling itself employs more than 100 people, most of whom earn head-of-household incomes with pension and healthcare benefits. The vast majority of these positions are filled by people of color, and all of these positions are now at serious risk of elimination if the LRF permit is not promptly issued.

45.     In addition, the City's failure to issue the permit to Southside Recycling has caused significant and potentially permanent damage to Southside Recycling's business. Now, the USEPA request has injected unlimited delay into a process already two years in the making. SR's suppliers have been forced to find other buyers for their scrap metal. SR's customers have had to turn to other recyclers to provide processed product. These suppliers and customers are not only lost for now, but may never be regained. The City's complete failure to follow its LRF Rules and Guidelines and to provide clear and honest messaging to the marketplace about the timing and process, in a manner consistent with the City's obligations, has left Southside Recycling without any ability to mitigate the damage to its business. The City's continued delay in issuing the permit also poses an extremely damaging threat to Southside Recycling's parent company, RMG, and its 1,500 employees around the country.

46.     As previously noted, the City has already received several rounds of public comments and, having reviewed and considered those comments, has concluded, and communicated to representatives of Southside Recycling, that the draft and final permits will be identical.  As a result, this Court should take immediate action under its power of mandamus and order the City to issue the final LRF permit, as required by the City's Municipal Code, the LRF Rules, and the City's Agreement with the owners of Southside Recycling.

## COUNT I
## MANDAMUS RELIEF TO ISSUE THE PERMIT

47.     Southside Recycling repeats and realleges allegations 1–46 as paragraph 47 in this Count I.

48.     Under Illinois law, the applicable governmental entity must issue a permit once the permit applicant meets the criteria imposed by the government.  The City reaffirmed this duty in a written agreement with RMG.  Moreover, Illinois law also provides that where the applicant has made a substantial change in its position in a good-faith reliance on the probability that a permit would be issued, the applicant has the right to engage in the permitted activity.

49.     Therefore, Southside Recycling requests that this Court order the City to issue its permit to operate a Large Recycling Facility.

50.     Southside Recycling has met all of the applicable permitting requirements under Section 11-4-2520 of the Municipal Code, and the LRF Rules.

51.     The City has failed to issue the permit to Southside Recycling in violation of the LRF Rules and the CDPH Guidelines.

52.     Southside Recycling has a clear right to the permit, Commissioner Arwady has the clear duty to issue the permit, and has the clear authority to comply with a writ of mandamus requiring her to act.  Therefore, the writ of mandamus should be issued.

## COUNT II
## INJUNCTIVE RELIEF

53.     Southside Recycling repeats and realleges allegations 1–52 as paragraph 53 in this Count II.

54.     Under Illinois law, the applicable governmental entity must issue a permit once the permit applicant meets the criteria imposed by the government.  The City reaffirmed this duty in a written agreement with RMG.  Moreover, Illinois law also provides that where the applicant has made a substantial change in its position in a good-faith reliance on the probability that a permit would be issued, the applicant has the right to engage in the permitted activity.

55.     Southside Recycling has met all of the applicable permitting requirements under Section 11-4-2520 of the Municipal Code, and the LRF Rules.

56.     The City has failed to issue the final permit to Southside Recycling in violation of the LRF Rules and the CDPH Guidelines.

57.     Southside Recycling has a clear right to the final permit. Southside Recycling will suffer immediate and irreparable harm if it is not permitted to use its property to operate a large recycling facility in a manner consistent with its LRF application and applicable laws, regulations and rules.  Therefore, this Court should enjoin the City from interfering with Southside Recycling's right to operate a large recycling facility consistent with its application and applicable law.

## COUNT III
## BREACH OF CONTRACT AGAINST THE CITY

58.     Southside Recycling repeats and realleges allegations 1–57 as paragraph 58 in this Count III.

59.     In its September 10, 2019 Agreement, the City promised RMG to reasonably cooperate in achieving the efficient, expeditious transition of Southside Recycling's

business to its Southeast Side facility, including reasonable assistance with processing and review of license and permit applications, and the scheduling of public hearings. The City further agreed to apply and enforce its LRF Rules and other regulations, permits and policies neutrally and consistently to RMG and other metal recycling facilities in the City; and also to make the CDPH Commissioner available to meet at RMG's request in order to manage issues of concern.

60.     Southside Recycling has met its obligations under the September 10, 2019 Agreement.

61.     The City has failed to honor its obligations under the Agreement in that it has failed to act efficiently and expeditiously, failed to enforce its rules neutrally and consistently among the City's metal recycling facilities, has violated its obligation to arrange requested meetings between Commissioner Arwady and Southside Recycling to address the parties' disputes, and has failed to issue the final LRF permit even after acknowledging that Southside Recycling has met each and every one of the permitting criteria.

62.     As a result, this Court should order specific performance of the Agreement, including the issuance of the final LRF permit.

63.     In addition, this Court should award Southside Recycling compensation for the lost profits and other damages and costs to its business on account of the City's failure to issue the LRF permit expeditiously.

## COUNT IV
## ILLEGAL TAKING BY THE CITY OF SOUTHSIDE RECYCLING'S PROPERTY IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

64.     Southside Recycling repeats and realleges allegations 1–63 as paragraph 64 in this Count IV.

65. The Fifth Amendment of the United States Constitution prohibits the government from taking private property without just compensation. The Fourteenth Amendment extends this prohibition to state and local governments.

66. By preventing Southside Recycling from operating a large metal recycling facility on property which RMG has owned for decades and on which it has the right, under all applicable ordinances and rules, to operate such a facility, the City has effectively taken the value of RMG's property without just compensation. This illegal taking is particularly pronounced because the City lured RMG into permanently ceasing operations at the North Side facility and constructing a new facility on the Southeast Side in order to meet all relevant rules for metal recycling operations.

67. Therefore, the City must provide just compensation to Southside Recycling for this illegal taking, including the future profits that Southside Recycling could earn by operating its large recycling facility on that property.

WHEREFORE, Plaintiffs General III, LLC d/b/a Southside Recycling and RMG Investment Group, LLC request that this Court award them and against Defendants Dr. Allison Arwady, in her official capacity as the Commissioner of the Chicago Department of Public Health, and the City of Chicago the following relief:

(1) An order of mandamus requiring the City of Chicago and Commissioner Arwady to issue to Southside Recycling a permit to operate a large recycling facility consistent with its application to do so;

(2) An injunction, enjoining the City from interfering with Southside Recycling's right to use its property to operate a large

recycling facility in a manner consistent with its LRF application and currently applicable laws, rules and regulations;

(3)     Award damages well in excess of $100 million to Southside Recycling and RMG Investment Group, LLC which they have suffered and will continue to suffer as a result of the City of Chicago's breach of the September 10, 2019 Agreement, its violation of its own permitting Rules and Guidelines, and its illegal taking of RMG's property without just compensation; and

(4)     Any further relief that this Court deems appropriate.

Dated:  May 17, 2021                    Respectfully submitted,

                                        GENERAL III, LLC d/b/a
                                        SOUTHSIDE RECYCLING

                                        and RMG INVESTMENT GROUP LLC

                                        By /s/ David J. Chizewer
                                            One of Their Attorneys

                                        David J. Chizewer
                                        GOLDBERG KOHN LTD.
                                        55 East Monroe Street
                                        Suite 3300
                                        Chicago, Illinois  60603
                                        (312) 201-4000
                                        david.chizewer@goldbergkohn.com

---

[1] https://external.epa.illinois.gov/WebSiteApi/api/PublicNotices/GetAirPermitDocument/6381, at pp. 18-23

[2] https://external.epa.illinois.gov/WebSiteApi/api/PublicNotices/GetAirPermitDocument/5950

[3] https://external.epa.illinois.gov/WebSiteApi/api/PublicNotices/GetAirPermitDocument/6380

---

[4] https://external.epa.illinois.gov/WebSiteApi/api/PublicNotices/GetAirPermitDocument/6381

[5] https://www.chicago.gov/content/dam/city/sites/rgm-expansion/documents/2020-11-12-Southside-Recycling-LRF-Permit-App.pdf

[6] https://www.chicago.gov/content/dam/city/sites/rgm-expansion/documents/2021-01-13-Southside-Recycling-CDPH-LRF-Permit-App.pdf

[7] https://www.chicago.gov/content/dam/city/sites/rgm-expansion/documents/Request-for-Information-3.17.21.pdf

[8] https://external.epa.illinois.gov/WebSiteApi/api/PublicNotices/GetAirPermitDocument/6381, at pp. 18-23

[9] https://www.chicago.gov/content/dam/city/sites/rgm-expansion/documents/Response-to-CDPH-Request-031721.pdf

[10] https://projects.bettergov.org/2018/10/env-burden-chicago/